SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------------------------------x

EMILIO TATIS

                                                Plaintiff,

                  -against-

DOOR DASH, INC.

                                            Defendants'.

--------------------------------------------------------------------------------x

Index No.:

**<u>SUMMONS</u>**

Plaintiff designates
New York County
as the place of trial
based on CPLR
503(c)

**TO THE ABOVE-NAMED DEFENDANTS**:

      **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your Answer, or if the complaint is not served with the summons, to serve a notice of appearance on Plaintiff's attorney within twenty (20) days after service of this summons, exclusive of the day of service, (or within thirty (30) days after service is complete, if this summons is not personally delivered to you within the State of New York); and in case of your failure to answer, judgment will be taken against you by default for the relief demanded hereto.

Dated:       New York, New York
              May 22, 2025

                                          _____/s/_____
                                          John Scola
                                          Law Office of John A. Scola, PLLC
                                          Attorneys for Plaintiff Emilio Tatis
                                          90 Broad Street, Suite 1023
                                          New York, New York 10004
                                          (917) 423-1445

<u>DEFENDANT ADDRESS:</u>
DOOR DASH  INC.
28 Liberty Street
New York, NY 10005

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------------------------------x

EMILIO TATIS

Index No.:

**<u>VERIFIED COMPLAINT</u>**

Plaintiff,

-against-

**JURY DEMAND**

DOOR DASH , INC

Defendants'

--------------------------------------------------------------------------------x

The Plaintiff, EMILIO TATIS  by his attorneys the LAW OFFICE OF JOHN A. SCOLA,

PLLC., as and for his complaint against defendants' DOOR DASH  INC. (collectively referred

to as "Defendant") for caretaker discrimination, disability association discrimination, hostile

work environment, and retaliation pursuant to New York City Local Law §8-107 et al. and New

York State Executive § 296.

## <u>INTRODUCTION</u>

This is a civil rights action on behalf of Plaintiff EMILIO TATIS  (hereinafter referred to

as "Plaintiff") to vindicate his rights related to the for caretaker discrimination, disability

association discrimination, hostile work environment, and retaliation created by the Defendant

DOOR DASH , INC. (hereinafter referred to as "DOOR DASH "), Individually. More

specifically, Plaintiff seeks compensatory, emotional distress and punitive damages against all

Defendant as well as attorney's fees related to the deprivation of Plaintiff's rights secured by

New York State Executive § 296, and New York City Local Law §8-107 et al. Plaintiff was

denied employment on the basis of his caretaker status, forced to work in a hostile work

environment, and retaliated against for lawfully protected complaints of said discrimination.

At all times herein. Plaintiff was treated in an unlawful manner in that he was discriminated and retaliated against due to his engagement in protected activity and in discrimination for his membership in a protected class

## **PLAINTIFF**

1. Plaintiff EMILIO TATIS is a male citizen of the United States of America, over twenty-one (21) years of age.

2. Plaintiff was the primary caretaker to his son who has autism.

3. Plaintiff is associated with his son who is disabled.

4. Plaintiff engaged in protected activity when he requested accommodation surrounding his son's disability and when he objected to unlawful discrimination.

## **DEFENDANTS'**

5. At all times mentioned herein, the Defendant, DOOR DASH, Inc., was a Foreign Corporation, duly authorized to conduct business under and existing by virtue of the laws of the State of New York.

6. Defendant DOOR DASH maintains an office in New York County and regularly conducts business in New York County and New York State.

7. At all times mentioned herein, the defendant, DOOR DASH , Inc., was a Delaware Corporation with its principal place of business in the State of California, County of San of San Francisco.

8. Defendant DOOR DASH, are equal opportunity employers which prohibit discriminatory employment actions against, and treatment of, their employees and applicants for employment based on actual or perceived race, color, national origin, alienage or citizenship status, religion or creed, gender (including "gender identity" --

which refers to a person's actual or perceived sex, and includes self-image, appearance, behavior or expression, whether or not different from that traditionally associated with the legal sex assigned to the person at birth), disability, age (18 and over), military status, prior record of arrest or conviction, caretaker status, marital status, partnership status, genetic information or predisposing genetic characteristic, sexual orientation, status as a victim or witness of domestic violence, sex offenses or stalking, and unemployment status.

## THE ARBITRATION AGREEMENT IS UNENFORCEABLE UNDER CPLR § 7515 AND GOVERNING LAW

9.  Plaintiff anticipates that Defendants may seek to compel arbitration of this matter pursuant to an arbitration agreement embedded in Plaintiff's employment documents.

10. However, as detailed herein, that agreement is legally unenforceable and does not bar Plaintiff's claims from proceeding in this Court.

11. The arbitration agreement, titled "Exhibit B" of the offer package, purports to waive Plaintiff's right to a jury trial and mandate arbitration of nearly all employment-related disputes.

12. While the document states that arbitration is not a mandatory condition of employment and that employees may opt out, it provides no meaningful explanation of the rights being waived, nor any prominent notice designed to alert employees to the gravity of those rights.

13. The clause is buried in dense legal text spanning multiple pages, and the language purporting to waive a jury trial is presented in ordinary capitalization rather than bold or otherwise conspicuous formatting.

14. This lack of clarity and prominence is particularly problematic where a constitutional right—such as the right to a jury trial—is purportedly being waived.

15. Plaintiff was never given a meaningful opportunity to review or negotiate the arbitration terms.

16. The clause was presented in a standard-form adhesion contract, on a take-it-or-leave-it basis, as part of a multi-document employment offer package from a multi-billion dollar company.

17. Plaintiff had no legal counsel at the time of execution and was not informed of the legal consequences of failing to opt out within 30 days.

18. Defendants made no affirmative disclosure of the implications of arbitration or the waiver of statutory and constitutional rights.

19. Even if the arbitration clause were otherwise valid, it is unenforceable under CPLR § 7515, which prohibits mandatory pre-dispute arbitration of employment discrimination claims in New York.

20. Plaintiff alleges unlawful discrimination and retaliation in violation of the New York State Human Rights Law (Executive Law § 296) and New York City Human Rights Law (NYCHRL 8-107), and these statutory claims are expressly protected from mandatory arbitration under New York law.

21. The arbitration clause is therefore void and unenforceable as against public policy under New York Civil Practice Law and Rules § 7515.

22. Plaintiff also reserves the right to challenge the arbitration agreement under additional legal theories, including but not limited to unconscionability, lack of mutuality, and the failure of consideration.

23. At a minimum, the validity of the arbitration clause presents questions of law and fact that must be adjudicated by this Court before any motion to compel arbitration may be granted.

24. Accordingly, Plaintiff respectfully submits that the arbitration agreement is invalid, unenforceable, and void, and that all claims in this matter are properly before the Court.

25. Plaintiff brings this case in New York Supreme Court, New York County as this is where Plaintiff's claims arose.

26. Plaintiff asserts his rights afforded him by the New York State legislature under CPLR §7515.

27. Plaintiff demands a jury trial in this matter.

## **FACTUAL ALLEGATIONS**

28. Plaintiff was hired as a Senior Security Engineer to work on the Security Operations Team in November 2022.

29. As part of his initial employment, Plaintiff was offered a salary of $200,000 and stock compensation valued at approximately $500,000, which would vest quarterly over a four (4) year period.

30. At the time Plaintiff joined the Company, the stock price was approximately $60 per share, and he was granted approximately 8,333 shares.

31. To date, Plaintiff has vested shares on ten (10) occasions.

32. Due to an increase in the Company's stock price, the value of his remaining unvested shares now exceeds $800,000.

33.  Since joining the Company, Plaintiff has consistently excelled.

Case 1:25-cv-04764-JPO   Document 6   Filed 06/06/25   Page 7 of 37

34. For the 2023 performance year, Plaintiff received a stellar performance review, which resulted in a 3% salary increase and an additional $80,000 worth of stock.

35. Plaintiff was currently employed as a Threat Response Engineer.

36. Heidenreich became Plaintiff's supervisor in August 2024.

37. Shortly thereafter, Plaintiff began experiencing issues with her.

38. During an early discussion regarding long-term career goals, Plaintiff expressed his desire to move into a management role within the Company.

39. In response, Heidenreich stated that she did not envision Plaintiff in such a role due to his home situation—specifically referencing his son's autism and suggesting that Plaintiff's focus should be on his son rather than pursuing advancement within the Company's Security team.

40. Plaintiff, and his wife, are primary caretaker to their son who has autism and is disabled.

41. Plaintiff's caretaker status is a protected category under New York City Human Rights Law.

42. At all times herein, Plaintiff performed his tasks in a stellar manner.

43. Plaintiff is told directly by Heidenreich that he does not have upward mobility within the Defendant DOOR DASH due to his caretaker status.

44. This lack of upward mobility within the Company due to his caretaker status cost Plaintiff hundreds of thousands of dollars due to unlawful discrimination.

45. Employees who do not have an autistic son they are a caretaker to are not treated in this manner and allowed to be promoted.

46. This inappropriate comment made clear that Plaintiff's upward mobility was being limited due to his association with his disabled son, for whom he is the primary caretaker.

47.   Plaintiff believes that his direct supervisor, Farley, was informed of Plaintiff's son's autism by Plaintiff's director, Heidenreich .

48.   In February 2025, Plaintiff had his first meeting with Farley .

49.   During the meeting, Farley asked very personal questions about Plaintiff's home and family life, including a request to describe his home life.

50.   Plaintiff was compelled to disclose his son's autism and explain that he and his wife are the primary caretakers.

51.   Plaintiff further explained that, due to his son's disability, he would need to take him to and from therapy appointments.

52.   None of these appointments impact Plaintiff's ability to perform the essential functions of his job, nor do they create a hardship for the Company.

53.   Further, Plaintiff had sought accommodation related to the care of his disabled son and due to his caretaker status.

54.   Furthermore, **unlike** under federal law, in New York, if Plaintiff requested an accommodation to care for his son, such a request constitutes protected activity under the New York City Human Rights Law.

55.   This protection was expressly codified by the New York City Council on June 25, 2019.

56.   Here following notice of Plaintiff' accommodation requests, he was informed that he could no longer be promoted within the Company by the Defendant due to his requests for accommodation.

57.   This constitutes unlawful retaliation against Plaintiff.

58.   In early 2025, following Plaintiff's accommodation requests, he receives a negative performance review (characterized as a "mixed review") from Heidenreich  and Farley.

59. This evaluation did not reflect Plaintiff's actual performance and served as a pretext for discrimination and retaliation.

60. For example, in December 2024, Plaintiff was instrumental in uncovering $22,000,000 in potential fraud related to the Company's failure to properly verify identifications.

61. Despite this significant contribution, Plaintiff received only a 1% raise instead of the standard 3%, costing him approximately $6,000 in lost income. Additionally, he was not awarded any bonus.

62. The lack of raise was directly related to unlawful discrimination and retaliation and not reflective of Plaintiff's true performance.

63. Plaintiff's caretaker status, association with his disabled son and request for accommodation drove the negative evaluation which was not reflective of Plaintiff's true performance and are pretextual for discrimination and retaliation.

64. Plaintiff should have received an additional $80,000 in stock compensation if the evaluations had accurately reflected his work performance.

65. Plaintiff was denied these employment benefits as a result of unlawful discrimination and retaliation.

66. Plaintiff's caretaker status, association with his disabled son and request for accommodation were factors in the negative evaluation, denial of raise and denial of full stock compensation.

67. As previously referenced, the discovery of $22,000,000 in fraud was a direct result of Plaintiff's investigative work in close coordination with the Trust and Safety team.

68. Plaintiff worked extensively with Critical Investigations Manager Kristin Kupiec. Through his efforts, Plaintiff identified hundreds of fake identities tied to shared

residential addresses in New York City, many of which appeared in clusters, with no internal mechanisms in place to detect such anomalies.

69.    In response, Plaintiff independently developed custom scripts and a novel methodology to identify these fraudulent clusters—demonstrating initiative, innovation, and an unwavering commitment to the Company's security mission.

70.    These fraudulent accounts were linked to a broad spectrum of criminal activity, including identity theft, financial fraud, robbery, and tax evasion.

71.    Notably, Plaintiff also surfaced critical issues involving undocumented individuals using the platform through unverified identities—a systemic failure compounded by inadequately configured identity verification tools.

72.    Plaintiff's findings were corroborated by peers and raised repeatedly with management, yet they were dismissed by Heidenreich, who instead restricted the Security Operations team's collaboration with the Trust and Safety department.

73.    This decision forced the team to prioritize case closures over investigations with serious real-world consequences for vulnerable individuals and public safety.

74.    The shift in priorities favored metrics and administrative tasks that Farley  has noted to the Plaintiff as trivial.

75.    Additionally, Plaintiff played a pivotal role in a recent investigation initiated at the directive of Chief Executive Officer Tony Xu.

76.    Plaintiff's contributions were publicly recognized by colleagues during a recorded meeting on April 9, 2025, further reinforcing his alignment with executive priorities and demonstrating his commitment to enhancing the Company's security posture.

77. This investigation coincided with the work of Detection Engineer Nikhil Verma, who was tasked with building nineteen (19) unique Okta detections within a compressed timeframe.

78. These detections triggered a wide range of investigations and led to subsequent system-wide bug fixes—nearly all of which involved case types that had previously been handled by Plaintiff.

79. Despite the complexity and critical nature of these issues, Farley , during a one-on-one Coaching Plan meeting with Plaintiff, dismissed the work as "minimal," "unimportant," and "easy."

80. Such disparaging remarks not only minimize Plaintiff's contributions but also devalue Mr. Verma's engineering efforts. Farley's comments reflect a profound lack of understanding of the technical depth required to execute these tasks and show a blatant disregard for one of DOOR DASH's core leadership tenets: to act at the lowest level of detail. This principle—which emphasizes operational excellence through meticulous attention to detail—has repeatedly been embodied by Plaintiff.

81. In reality, the comments by Farley are masking unlawful discrimination and retaliation in order to discharge Plaintiff related to his association with his disabled son and accommodations related thereto.

82.  Notably, under the supervision of Farley  and Heidenreich, Plaintiff uncovered two separate company-wide failures involving Slack and Okta security protocols.

83. These discoveries would not have been possible without Plaintiff's deep subject matter expertise and diligence.

84. Plaintiff's performance is consistently criticized during one-on-one meetings with Farley.

85. Plaintiff is one of four engineers on his team, which handles approximately 600 cases per year.

86. In 2024 alone, Plaintiff personally handled 300 of those cases.

87. Despite the unfavorable evaluations, Plaintiff continues to excel in his role. In 2025, he is responsible for closing 50% of the team's cases.

88. Yet, despite this outstanding performance, Plaintiff is told that he still needs to improve.

89. Despite these obvious achievements, on March 6, 2025, Plaintiff was abruptly placed on a Coaching Plan.

90. The Coaching Plan is facially discriminatory and retaliatory.

91. Given Plaintiff's peer reviewed stellar performance, the Coaching Plan is pretextual for discrimination.

92. In the Plan, he is falsely accused of being unavailable due to the need to care for his dependent.

93. Shockingly, the Plan states that Plaintiff sought and was granted an accommodation, and then uses that very accommodation as the basis for disciplining him.

94. The Plan entirely disregards New York law, which applies a hardship standard to accommodation requests.

95. It appears facially retaliatory under New York law.

96. The Coaching Plan given to Plaintiff is the equivalent of the Defendant saying that Plaintiff is being put on a Coaching Plan because he is Hispanic.

97. Specifically, the Coaching Plan states on page two that "Throughout Jan 25 and Feb 25 (specifically, 6 Feb, 18 Feb, 19 Feb), you were required to be unavailable on numerous

Case 1:25-cv-04764-JPO    Document 6    Filed 06/06/25    Page 13 of 37

occasions for short and extended periods of time in order to provide necessary care for your dependent."

98. This is describing protected activity under New York City Human Rights Law.

99. Further, the Coaching Plan then says, "On each occasion, you requested and were provided authorization to do so."

100. This means that Plaintiff engaged in protected activity in requesting an accommodation which was approved by the Defendant.

101. This approved accommodation request, is then cited, as a reason for placing Plaintiff on the Coaching Plan.

102. This is facially discriminatory and retaliatory.

103. The Defendant seems to be so comfortable discriminating against its employees that it feels comfortable placing the unlawful reason for the discrimination in writing.

104. The lack of care and thought that went into drafting it is reflective of the Defendant's lack of care towards its employees, including Plaintiff.

105. Plaintiff is also falsely accused of failing to update his supervisors about his cases.

106. When Plaintiff explains that he provides regular updates and avoids using informal Slack channels due to disclosure protocols, he is met with silence.

107. The Defendant has no legitimate basis for the unlawful discipline of Plaintiff.

108. The reasons offered by the Defendant are pretextual for discrimination and retaliation as they are demonstrably false.

109. Plaintiff asks for guidance on how frequently he should be updating his supervisors but receives little to no direction.

110. He is told that his colleague, Ashley "Ash" Barwick, provides regular updates.

111. Plaintiff simply requests an example of how Ashley communicates with the supervisors so that he can learn and improve.

112. This request is denied, and the supervisors are unable to explain what specific steps Plaintiff should take to meet expectations.

113. One of the main concerns Heidenreich and Farley have with Plaintiff is their claim that he fails to provide updates on his casework.

114. However, Plaintiff's colleagues regularly discuss cases in an "attorney-client" portal that includes no attorneys, meaning the communications are not privileged.

115. This violates Company protocol, which outlines a specific system for Security Engineers to follow.

116. Despite this, Plaintiff has been pressured to use this unofficial "attorney-client" Slack channel, which lacks privilege and falls outside approved procedures.

117. Farley and Heidenreich continue to rely on these informal channels for convenience, ignoring the Company's standard security protocols.

118. Plaintiff's adherence to proper protocol has made him a target for criticism, while others who bypass procedures face no accountability—treatment that is both retaliatory and discriminatory.

119. Prior to joining the Company, Plaintiff worked at the New York County District Attorney's Office, where strict adherence to protocol was essential.

120. Here, Heidenreich and Farley are punishing Plaintiff for doing the same.

121. This harassment is pretext for discrimination and retaliation.

122. Furthermore, casework is openly discussed in informal Slack channels outside the designated case communication thread, further violating protocol.

123. Recorded meeting held on March 11, 2025, provide clear evidence that senior management was aware of systemic deficiencies within the Security Operations team, yet took no corrective action.

124. Instead, Plaintiff was repeatedly subjected to retaliatory treatment for raising legitimate operational and security concerns.

125. During the March 11 meeting, even representatives from Google acknowledged that the newly implemented security operations tool lacked critical functionality—validating the very issues Plaintiff had raised for months.

126. Rather than pursuing substantive improvements to team operations, management prioritized inflated narratives to justify increased budgets and managerial authority, while avoiding the technical responsibilities central to the team's mission.

127. This misalignment was evident in their dismissal of complex investigations surfaced by Detection Engineering and pursued by Plaintiff.

128. In one internal Slack message, a case was referred to within the internal Slack channel "proj-whitecap" as a "tactical move…to convince him," referring to the CISO—revealing the use of investigative work for political leverage rather than fact-finding.

129. On March 28, 2025 Plaintiff met with Chief Information Officer Suha Can discuss the harassment, discrimination, and retaliation.

130. During this meeting, Plaintiff also discloses to Can that the Office is failing to follow the protocol for secure information sharing, thereby eviscerating the attorney-client privilege the Company is seeking to protect for litigation purposes.

131. Plaintiff further reported concerns involving improper hiring practices and procurement misconduct within the Security organization.

132. Plaintiff also revisited a prior incident involving Heidenreich, wherein she had been instructed by the Company's Legal Department to revise the Incident Response Plan.

133. Despite her limited tenure and lack of institutional knowledge, she dismissed the plan as "too legal-centric" and subsequently failed to revise or implement it in accordance with legal guidance.

134. This failure not only demonstrated a troubling disregard for Legal's directives but also reflected a broader pattern of noncompliance with company policy.

135. Plaintiff expressed concern that such conduct exemplified a systemic lack of accountability and managerial integrity, further reinforcing the pattern of impropriety and retaliatory treatment he was subjected to.

136.  Following this, Plaintiff speaks with Human Resources to formally complain about the harassment and discrimination, including a comparison of the preferential treatment granted to Farley—who openly acknowledged receiving personal family accommodations granted by Heidenreich —highlighting the clear discriminatory bias against Plaintiff.

137. While Farley's familial obligations were freely accommodated by DOOR DASH , Plaintiff's similar requests were treated as performance concerns. This disparate treatment reflects a double standard and underscores the discriminatory animus motivating Plaintiff's exclusion from professional opportunities.

138. Further compounding these concerns was Farley's acknowledged lack of technical expertise, which directly contributed to widespread dysfunction within the Security Operations team. Farley admitted that he had accepted his role as Senior Manager— despite there being no existing managers under his supervision to necessitate such a

position—as a personal favor to Heidenreich, having been retired prior to joining the Company.

139. Farley described himself as a "micro knower," a term he embraced despite lacking the subject-matter expertise required to effectively lead a technical team. As a result, Plaintiff and his colleagues were repeatedly subjected to unnecessary scrutiny and compelled to over-explain even the most basic elements of their investigative work. This dynamic not only fostered persistent inefficiencies but also placed an undue burden on the employees responsible for safeguarding the Company's security posture.

140. No investigation is conducted, and the unlawful actions are allowed to continue.

141. At the end of the 30-day Coaching Plan, Plaintiff is informed that he has not shown improvement during that time.

142. Plaintiff asks what he failed to do but is not given any feedback.

143. Plaintiff is given no feedback as there is nothing he can do to reverse the unlawful and adverse actions being taken against him.

144. Plaintiff is being terminated due to his caretaker status, association with his disabled son and for seeking accommodation related thereto.

145. The Defendants cannot terminate Plaintiff for these reasons as they are unlawful.

146. In order to mask their discriminatory intent, Plaintiff is placed on a Coaching Plan which specifically details that he is placed on the plan for unlawful reasons.

147. Further, Plaintiff is not told how he could improve in anyway.

148. He then speaks with Employee Relations, believing it is unfair to be terminated without any guidance on how to improve.

149. Employee Relations immediately stops the termination as it is clearly unlawful.

150. Specifically, Employee Relations informs Heidenreich and Farley that they must provide an employee with ways to improve when placed on Coaching Plan.

151. The intervention by Employee Relations delays the termination.

152. Farley is instructed to provide Plaintiff with feedback on the Plan, despite the fact that since the start of the Coaching Plan, he had failed to provide Plaintiff with any tangible feedback or supporting documentation.

153. At the time he was directed to do so, the Coaching Plan had already entered its fourth and final week of the designated four-week evaluation period, rendering any such feedback untimely and ineffective.

154. By April 3, 2025, the severity of these operational failures had escalated to the point where Chief Information Security Officer Suha Can directly questioned Heidenreich's excessive procurement activity and lack of measurable outcomes, highlighting a pattern of managerial misalignment and dysfunction.

155. Despite the legitimacy of these concerns, which have since been substantiated, Plaintiff has been unfairly blamed for purportedly misusing the tool—despite its ongoing deficiencies, including improper configuration and insufficient support.

156. This meeting was also recorded.

157. On April 8, 2025[1] Plaintiff's Coaching Plan is extended by one week, until April 17, 2025.

158. On April 10, 2025, Plaintiff meets with Farley, who is visibly angry that Plaintiff complained about the discriminatory and retaliatory harassment he has endured.

159. During the meeting, Plaintiff is told that he is not handling enough cases, despite handling the most on the team.

160. Plaintiff explains that he handles the most cases on the team by Farley explains to Plaintiff that he only performs the most because he takes easier cases.

161. Plaintiff is the most senior person on the team and handles the most difficult assignments.

162. The explanation by Farley makes little sense and is clearly masking the underlying unlawful reasons for Plaintiff's termination.

163. He is further told that his performance is "subjective" and fails to give Plaintiff any metrics by which he can improve.

164. Farley further indicates that Plaintiff will not be able to improve his job performance.

165. Farley specifically states that the Coaching Plan is based solely on his own subjective perspective, and he refuses to provide Plaintiff with any quantifiable metrics, documentation, or data-driven feedback from which Plaintiff could meaningfully assess or improve his performance.

166. It appears clear that Plaintiff will be terminated during this time.

167. None of Farley's comments about Plaintiff's performance are accurate and serve only as a pretext for discrimination and retaliation.

168. Furthermore, this termination will occur less than two (2) weeks after Plaintiff engaged in protected activity with Employee Relations and Mr. Can.

169. This instance of retaliation is not isolated.

170. Since December 2024, Plaintiff has consistently raised concerns regarding Heidenreich's expedited implementation of a Google-based security operations tool, citing significant deficiencies—including its failure to replace existing technologies and its lack of essential case-related functionality.

171. On April 15, 2025, Plaintiff, through his counsel sent a letter to the Defendant detailing the discrimination he has been forced to endure.

172. The letter to the General Counsel for the Defendant detailed the discrimination and retaliation that Plaintiff has been forced to endure as specified herein.

173. The Defendant did not even contact Plaintiff nor his counsel regarding the complaints of discrimination before taking adverse action against Plaintiff.

174. On April 17, 2025, Less than forty-eight hours after Plaintiff engaged in that protected activity, he was terminated by the Defendant.

175. Plaintiff was terminated in retaliation for his protected complaints of discrimination and retaliation.

176. The termination of Plaintiff within forty-eight hours of his engagement in protected activity is facially retaliatory and done purposefully to dissuade others from engaging in protected activity.

177. As a result of that unlawful termination, Plaintiff lost more than $800,000 in lost stock options that he was entitled.

178. The Defendant pretextual reason for the performance improvement plan and the termination was Plaintiff requesting accommodation to care for his disabled son.

179. That request, which was approved, constituted protected activity under New York City Human Rights Law.

180. The justification for termination of Plaintiff is facially discriminatory.

181. At all times herein, Plaintiff was a member of a protected class in that he was a caretaker to his son.

Case 1:25-cv-04764-JPO    Document 6    Filed 06/06/25    Page 21 of 37

182.   At all times herein, Plaintiff was a member of a protected class in that he was associated with his son who is disabled.

183.   At all times herein Plaintiff excelled in his position with the Defendant.

184.   Plaintiff suffered more than petty sleights and trivial inconvenience as a result of his being a member of a protected class including but not limited to, his caretaker status and association with his son who is disabled.

185.   At all times herein. Plaintiff was treated less well due to his caretaker status and association with his son who is disabled which caused him to work in a hostile work environment.

186.   At all times herein, Plaintiff was retaliated against for his protected requests for accommodation to care for his son in a manner that would dissuade others from engaging in protected activity.

187.   The Defendant notice of the caretaker discrimination, disability association discrimination, retaliation and harassment dating back to 2024, and subsequent failure to take prompt and effective remedial action and/or that the Defendant should have known and failed to exercise reasonable diligence to prevent future acts, the Defendant are strictly liable to Plaintiff pursuant to New York City Human Rights Law (hereinafter referred to as "NYCHRL") §8-107(13)(b).

188.   As a result of the Defendant failure to prevent the discriminatory atmosphere in which Plaintiff was subjected, the intentional, malicious, and reckless indifference that resulted in discrimination and retaliation of Plaintiff, Defendant are subjected to punitive damages in this action.

189. The Defendant failure to intervene and protect Plaintiff, despite knowing that employment discrimination and retaliation to be unlawful which is common knowledge in today's society that employment discrimination and retaliation is impermissible Plaintiff is entitled to an award of punitive damages.

190. The Defendant egregious misconduct is evidence of the Defendant mental state of intentional discrimination and retaliation.

191. The Defendant herein were aware of that Plaintiff participated in protected activity when he made these complaints and sought accommodation.

192. Plaintiff suffered disadvantageous employment actions, which were more than petty slights, and trivial inconveniences when he was denied promotional opportunities and labeled a problem by the Defendant herein.

193. Plaintiff suffered more than petty slights and trivial inconveniences as a result of the discriminatory and retaliatory actions of the Defendant herein.

194. Plaintiff alleges that the actions of the Defendant herein caused him to suffer severe and pervasive emotional distress as a result of that hostile environment.

## COUNT I
### CARETAKER DISCRIMINATION
### IN VIOLATION OF NEW YORK CITY
### ADMINISTRATIVE CODE § 8-107
### AGAINST ALL DEFENDANTS

195. Plaintiff re-alleges all paragraphs herein and incorporates them by reference in this count.

196. Plaintiff alleges that New York City Administrative Code § 8-107, makes it unlawful to deny employment on the basis of his caretaker status to his child.

197.    Plaintiff is a caretaker to his child wherein he is responsible for caring for his child and his mobility, eating, housekeeping, cooking, shopping, money management, banking, and driving.

198.    Plaintiff performed his job duties satisfactorily which is reflected in Plaintiffs stellar performance evaluations. Nevertheless, Defendant denied Plaintiff benefits of employment, including all favorable conditions and emoluments thereof because of Plaintiff's caretaker status, created a hostile work environment by the conduct of Defendant without any non-discriminatory basis thereof. The wrongful conduct was condoned by the Defendant DOOR DASH.

199.    Defendants' actions were taken under circumstances giving rise to an inference of discrimination.

200.    The direct and proximate cause of Defendants' recklessness and negligence, Plaintiff was denied promotional opportunities, overtime, suffered lost past and future wages, lost other valuable benefits and emoluments of employment, hurt his credit rating, business opportunities, suffered severe damage to his good name and reputation, and endured severe emotional pain and trauma, all to his detriment.

201.    Plaintiff alleges Defendant engaged in various unlawful employment actions against Plaintiff based on his caretaker status.

202.    Plaintiff alleges that as a direct and proximate result of the unlawful employment practices of Defendant, Plaintiff incurred significant legal costs, back pay, front pay, compensatory damages, punitive damages, attorneys' fees,  emotional distress, and damage to his personal and professional reputation.

## COUNT II
### CARETAKER DISCRIMINATION
### HOSTILE WORK ENVIRONMENT
### IN VIOLATION OF NEW YORK CITY
### ADMINISTRATIVE CODE § 8-107
### AGAINST ALL DEFENDANTS

203. Plaintiff re-alleges all paragraphs herein and incorporates them by reference in this count.

204. Plaintiff alleges that New York City Administrative Code § 8-107, makes it unlawful to deny employment on the basis of his Caretaker Status.

205. Plaintiff alleges that New York City Administrative Code § 8-107, makes it unlawful to deny employment on the basis of his caretaker status of his child or based on his association with someone who is disabled..

206. Plaintiff is a caretaker to his children wherein he is responsible for caring for his child, and is responsible for his mobility, eating, housekeeping, cooking, shopping, money management, banking, and driving.

207. At all times herein Plaintiff was treated less well due to his caretaker status which causes him to have to work in a hostile work environment.

208. Plaintiff performed his job duties satisfactorily which is reflected in Plaintiffs stellar performance evaluations. Nevertheless, Defendant denied Plaintiff benefits of employment, including all favorable conditions and emoluments thereof because of Plaintiff's status, created a hostile work environment by the conduct of Defendant and without any non-discriminatory basis thereof. The wrongful conduct was condoned by the Defendant.

209. Defendants' actions were taken under circumstances giving rise to an inference of discrimination.

210.  Defendant subjected Plaintiff to a materially adverse and hostile work environment by subjecting him, day after day, without supervisory intervention to discrimination and retaliation based on his caretaker status.

211.  The actions of the Defendant towards Plaintiff were severe and pervasive.

212.  The direct and proximate cause of Defendants' recklessness and negligence, Plaintiff was denied promotional opportunities, overtime, suffered lost past and future wages, lost other valuable benefits and emoluments of employment, hurt his credit rating, business opportunities, suffered severe damage to his good name and reputation, and endured severe emotional pain and trauma, all to his detriment.

213.  Plaintiff alleges Defendant, engaged in various unlawful employment actions against Plaintiff based on his caretaker status and association with his disabled child.

214.  Plaintiff alleges that as a direct and proximate result of the unlawful employment practices, including subjecting Plaintiff to a hostile work environment, of Defendant, Plaintiff incurred significant legal costs, back pay, front pay, compensatory damages, punitive damages, attorneys' fees, emotional distress, and damage to his personal and professional reputation.

## COUNT III
### CARETAKER DISRIMINATION
### STRICT LIABILITY IN VIOLATION OF
### NEW YORK CITY ADMINISTRATIVE CODE § 8-107(13)(b)
### AGAINST ALL DEFENDANTS

215.  Plaintiff re-alleges all paragraphs herein and incorporates them by reference in this count.

216.  Plaintiff alleges that New York City Administrative Code § 8-107 (13) (b), makes a Defendant strictly liable for the acts of managers and supervisors against a subordinate employee, such as the Plaintiff herein.

217. Plaintiff was subjected to repeated retaliatory acts following the lawful complaints made by Plaintiff regarding caretaker, and disability association discrimination.

218. The Defendant were aware of the actions of managers and supervisors, including Plaintiff's direct supervisors, but failed to take corrective remedial action which forced Plaintiff to be subjected to future retaliation.

219. Plaintiff's direct supervisors, at all times herein, were supervisors of Plaintiff who caused Plaintiff to suffer discrimination and retaliation.

220. The Defendant failed to exercise reasonable diligence to prevent such unlawful conduct.

221. Plaintiff performed his job duties satisfactorily which is reflected in Plaintiffs stellar performance evaluations. Nevertheless, Defendant denied Plaintiff benefits of employment, including all favorable conditions and emoluments thereof because of Plaintiff's status, created a hostile work environment by the conduct of Defendant and without any non-discriminatory basis thereof. The wrongful conduct was condoned by the Defendant DOOR DASH.

222. Defendants' actions were taken under circumstances giving rise to an inference of discrimination.

223. The direct and proximate cause of Defendants' recklessness and negligence, Plaintiff was denied promotional opportunities, overtime, suffered lost past and future wages, lost other valuable benefits and emoluments of employment, hurt his credit rating, business opportunities, suffered severe damage to his good name and reputation, and endured severe emotional pain and trauma, all to his detriment.

224. Plaintiff alleges Defendant, engaged in various unlawful employment actions against Plaintiff in retaliation for his lawfully protected complaints of discrimination.

225.   Plaintiff alleges that as a direct and proximate result of the unlawful employment practices of Defendant, Plaintiff incurred significant legal costs, back pay, front pay, compensatory damages, punitive damages, attorneys' fees,  emotional distress, and damage to his personal and professional reputation.

226.   As a result of Defendant willful actions, they are strictly liable to Plaintiff for their actions.

## COUNT IV
## RETALIATION
## IN VIOLATION OF NEW YORK CITY
## ADMINISTRATIVE CODE § 8-107
## AGAINST ALL DEFENDANTS

227.   Plaintiff re-alleges all paragraphs herein and incorporates them by reference  in this count.

228.   Plaintiff alleges that New York City Administrative Code § 8-107, makes it unlawful to deny employment in retaliation for Plaintiff engaging in protected activity.

229.   Plaintiff engaged in protected activity when he requested accommodation to care for his child.

230.   Plaintiff was retaliated against by the Defendant, Individually, as a result of his engagement in protected activity.

231.   Defendants' actions were taken under circumstances giving rise to an inference of retaliation.

232.   The direct and proximate cause of Defendants' recklessness and negligence, Plaintiff, suffered lost past and future wages, lost other valuable benefits and emoluments of employment, hurt his credit rating, lost career, and business opportunities, suffered severe damage to his good name and reputation, and endured severe emotional pain and trauma, all to his detriment.

Case 1:25-cv-04764-JPO    Document 6    Filed 06/06/25    Page 28 of 37

233.    Plaintiff alleges Defendant, engaged in various unlawful employment actions against Plaintiff in retaliation for Plaintiff's lawfully protected complaints.

234.    Plaintiff alleges that as a direct and proximate result of the unlawful employment practices of Defendant, Plaintiff incurred significant legal costs, back pay, front pay, compensatory damages, punitive damages, attorneys' fees, emotional distress, and damage to his personal and professional reputation.

**COUNT V
RETALIATION
IN VIOLATION OF NEW YORK
STATE EXECUTIVE LAW § 296
AGAINST ALL DEFENDANTS**

235.    Plaintiff re-alleges all paragraphs herein and incorporates them by reference in this count.

236.    Plaintiff alleges that New York State Executive Law §296, makes it unlawful to deny employment and benefits therein in retaliation for Plaintiff engaging in lawfully protected activity.

237.    Plaintiff engaged in protected activity when he requested an accommodation to care his child.

238.    Plaintiff was retaliated against by the Defendant, as a result of his engagement in protected activity.

239.    Defendants' actions were taken under circumstances giving rise to an inference of retaliation.

240.    The direct and proximate cause of Defendants' recklessness and negligence, Plaintiff lost significant income, suffered lost past and future wages, lost other valuable benefits and emoluments of employment, hurt his credit rating, lost career, and business opportunities,

Case 1:25-cv-04764-JPO    Document 6    Filed 06/06/25    Page 29 of 37

suffered severe damage to his good name and reputation, and endured severe emotional pain and trauma, all to his detriment.

241. Plaintiff alleges Defendant, engaged in various unlawful employment actions against Plaintiff in retaliation for Plaintiff's lawfully protected complaints.

242. Plaintiff alleges that as a direct and proximate result of the unlawful employment practices of Defendant, Plaintiff incurred significant legal costs, back pay, front pay, compensatory damages, attorneys' fees, emotional distress, and damage to his personal and professional reputation.

### COUNT VI
### RETALIATION
### STRICT LIABILITY IN VIOLATION OF
### NEW YORK CITY ADMINISTRATIVE CODE § 8-107(13)(b)
### AGAINST ALL DEFENDANTS

243. Plaintiff re-alleges all paragraphs contained herein and incorporates them by reference of Count VI of this complaint.

244. Plaintiff alleges that New York City Administrative Code § 8-107 (13) (b), makes a Defendant strictly liable for the acts of managers and supervisors against a subordinate employee, such as the Plaintiff herein.

245. Plaintiff was subjected to repeated retaliatory acts following the lawful complaints made by Plaintiff regarding his caretaker status and association with his disabled child discrimination.

246. The Defendant DOOR DASH was aware of the actions of managers and supervisors, including the unlawful actions of Farley, Heidenreich and Employee Relations. The Defendant failed to exercise reasonable diligence to prevent such retaliatory conduct.

Case 1:25-cv-04764-JPO    Document 6    Filed 06/06/25    Page 30 of 37

247. Plaintiff performed his job duties satisfactorily which is reflected in Plaintiffs stellar performance evaluations and numerous commendations. Nevertheless, Defendant denied Plaintiff benefits of employment, including all favorable conditions and emoluments thereof because of Plaintiff's complaints of discrimination and hostile work environment by the conduct of Defendants, and without any non-discriminatory basis thereof. The wrongful conduct was condoned by the Defendant DOOR DASH.

248. Defendants' actions were taken under circumstances giving rise to an inference of retaliation.

249. The direct and proximate cause of Defendants' recklessness and negligence, Plaintiff lost his job, suffered lost past and future wages, lost other valuable benefits and emoluments of employment, lost career, and business opportunities, suffered severe damage to his good name and reputation, and endured severe emotional pain and trauma, all to his detriment.

250. Plaintiff alleges Defendants, engaged in various unlawful employment actions against Plaintiff in retaliation for his lawfully protected complaints of disability and caretaker discrimination.

251. Plaintiff alleges that as a direct and proximate result of the unlawful employment practices of Defendants, Plaintiff incurred significant legal costs, back pay, front pay, compensatory damages, punitive damages, attorneys' fees, emotional distress, and damage to his personal and professional reputation.

252. As a result of Defendant willful actions, they are strictly liable to Plaintiff for their actions.

Case 1:25-cv-04764-JPO    Document 6    Filed 06/06/25    Page 31 of 37

## COUNT VII
### DISABILITY ASSOCIATION
### STRICT LIABILITY IN VIOLATION OF
### NEW YORK CITY ADMINISTRATIVE CODE § 8-107(13)(b)
### AGAINST ALL DEFENDANTS

253. Plaintiff re-alleges all paragraphs herein and incorporates them by reference in Count VII of this complaint.

254. Plaintiff alleges that New York City Administrative Code § 8-107 (13) (b), makes a Defendant strictly liable for the discriminatory acts of managers and supervisors against a subordinate employee, such as the Plaintiff herein.

255. At all times herein Defendant Farley and Heidenreich were supervisors of Plaintiff.

256. Plaintiff was subjected to discrimination due to his association with someone who is disabled

257. The Defendant was aware of the actions of managers and supervisors, but failed to take corrective remedial action which forced Plaintiff to be subjected to discrimination based on his caretaker status.

258. The Defendant failed to exercise reasonable diligence to prevent such discriminatory conduct.

259. Plaintiff performed his job duties satisfactorily which is reflected in Plaintiffs stellar performance evaluations. Nevertheless, Defendant denied Plaintiff benefits of employment, including all favorable conditions and emoluments thereof because of Plaintiff's caretaker status, created a hostile work environment by the conduct of the Defendant and without any non-discriminatory basis thereof. The wrongful conduct was condoned by the Defendant DOOR DASH.

260. Defendants' actions were taken under circumstances giving rise to an inference of discrimination.

Case 1:25-cv-04764-JPO    Document 6    Filed 06/06/25    Page 32 of 37

261.    The direct and proximate cause of Defendants' recklessness and negligence, Plaintiff was denied overtime, suffered lost past and future wages, lost other valuable benefits and emoluments of employment, hurt his credit rating, business opportunities, suffered severe damage to his good name and reputation, and endured severe emotional pain and trauma, all to his detriment.

262.    Plaintiff alleges Defendant, engaged in various unlawful employment actions against Plaintiff based on his caretaker association.

263.    Plaintiff alleges that as a direct and proximate result of the unlawful employment practices of Defendant, Plaintiff incurred significant legal costs, back pay, front pay, compensatory damages, punitive damages, attorneys' fees,  emotional distress, and damage to his personal and professional reputation.

264.    As a result of Defendant willful actions, they are strictly liable to Plaintiff for their actions.

## COUNT VIII
### DISABILITY ASSOCIATION DISCRIMINATION
### IN VIOLATION OF NEW YORK CITY
### ADMINISTRATIVE CODE § 8-107
### AGAINST ALL DEFENDANTS

265.    Plaintiff re-alleges all paragraphs herein and incorporates them by reference in this Count.

266.    Plaintiff alleges that New York City Administrative Code § 8-107, makes it unlawful to deny employment on the basis of their association with someone who is disabled.

267.    Plaintiff alleges that he was subjected to employment discrimination due to his association with someone is disabled.

268.    Plaintiff was subjected to adverse employment actions and actions that are more than petty sleights and trivial inconvenience.

Case 1:25-cv-04764-JPO    Document 6    Filed 06/06/25    Page 33 of 37

269.    Plaintiff performed his job duties satisfactorily which is reflected in Plaintiffs stellar performance evaluations. Nevertheless, Defendant denied Plaintiff benefits of employment, including all favorable conditions and emoluments thereof because of Plaintiff's association with someone who is disabled, created a hostile work environment by the conduct of Defendant without any non-discriminatory basis thereof. The wrongful conduct was condoned by the Defendant.

270.    Defendants' actions were taken under circumstances giving rise to an inference of discrimination.

271.    The direct and proximate cause of Defendants' recklessness and negligence, Plaintiff was denied promotional opportunities, overtime, suffered lost past and future wages, lost other valuable benefits and emoluments of employment, hurt his credit rating, business opportunities, suffered severe damage to his good name and reputation, and endured severe emotional pain and trauma, all to his detriment.

272.    Plaintiff alleges Defendant, engaged in various unlawful employment actions against Plaintiff based on his association with someone who is disabled.

273.    Plaintiff alleges that as a direct and proximate result of the unlawful employment practices of Defendant, Plaintiff incurred significant legal costs, back pay, front pay, compensatory damages, punitive damages, attorneys' fees, emotional distress, and damage to his personal and professional reputation.

## COUNT IX
## DISABILITY ASSOCIATION DISCRIMINATION
## HOSTILE WORK ENVIRONMENT
## IN VIOLATION OF NEW YORK CITY
## ADMINISTRATIVE CODE § 8-107
## AGAINST ALL DEFENDANTS

274.    Plaintiff re-alleges all paragraphs herein and incorporates them by reference in this Count.

Case 1:25-cv-04764-JPO    Document 6    Filed 06/06/25    Page 34 of 37

275. Plaintiff alleges that New York City Administrative Code § 8-107, makes it unlawful to deny employment on the basis of his association with someone who is disabled

276. Plaintiff performed his job duties satisfactorily which is reflected in Plaintiffs stellar performance evaluations. Nevertheless, Defendant denied Plaintiff benefits of employment, including all favorable conditions and emoluments thereof because of Plaintiff's association with someone who was being discriminated against based on their disability, created a hostile work environment by the conduct of Defendant and without any non-discriminatory basis thereof. The wrongful conduct was condoned by the Defendant.

277. Defendants' actions were taken under circumstances giving rise to an inference of discrimination.

278. Defendant subjected Plaintiff to a materially adverse and hostile work environment by subjecting him, day after day, without supervisory intervention to discrimination based on his association with someone who is disabled.

279. The actions of the Defendant towards Plaintiff were severe and pervasive.

280. The direct and proximate cause of Defendants' recklessness and negligence, Plaintiff was denied promotional opportunities, overtime, suffered lost past and future wages, lost other valuable benefits and emoluments of employment, hurt his credit rating, business opportunities, suffered severe damage to his good name and reputation, and endured severe emotional pain and trauma, all to his detriment.

281. Plaintiff alleges Defendant, engaged in various unlawful employment actions against Plaintiff based on his association with someone who is disabled.

282. Plaintiff alleges that as a direct and proximate result of the unlawful employment practices, including subjecting Plaintiff to a hostile work environment, of Defendant, Plaintiff incurred significant legal costs, back pay, front pay, compensatory damages, punitive damages, attorneys' fees, emotional distress, and damage to his personal and professional reputation.

## JURY TRIAL

283. Plaintiff demands a trial by jury of all issues in this action that are so triable.

## PRAYER
## FOR RELIEF

WHEREFORE, Plaintiff respectfully request that the Court:

a. Award compensatory damages for the back pay, front pay, pain, suffering, emotional distress, loss of dignity, humiliation, and damages to reputation and livelihood endured by Plaintiff and all other damages afforded to Plaintiff by statute or otherwise in an amount to be determined at trial.

b. Award Plaintiff punitive damages in an amount to be determined at trial New York City Human Rights Law Administrative Code §8-502(a).

c. Find Defendant strictly liable pursuant to New York City Human Rights Law Administrative Code §8-107(13)(b).

d. Award Plaintiff costs for this action and reasonably attorneys' fees, as provided for in New York City Human Rights Law Administrative Code §8-502 (f).

e. All Defendant herein are joint and severally liable for the actions of the any and all of the named Defendant herein.

f.  Grant Plaintiff such other and further relief as may be required in the interest of

justice.

Dated: May  22, 2023
New York, NY

Respectfully submitted,

By:____/s/_____
        John Scola

Law Office of John A. Scola, PLLC
Attorneys for Plaintiff Emilio Tatis
90 Broad Street, 10th Floor
New York, New York 10004
(917) 423-1445
jscola@johnscolalaw.com

Case 1:25-cv-04764-JPO    Document 6    Filed 06/06/25    Page 37 of 37

## VERIFICATION

STATE OF NEW YORK    )
COUNTY OF NEW YORK  )

I, the undersigned, an attorney duly admitted to practice law in the State of New York, under penalties of perjury do affirm.

That I am the attorney of record for the plaintiff in the within matter and make this affirmation in accordance with CPLR 3020. I have read the within VERIFIED COMPLAINT and know the contents thereof to be true to the affirmants own knowledge, with the exception of those matters therein stated to be alleged upon information and belief. Your affirmant bases his belief regarding those matters upon the contents of the file and conversation with witnesses and the claimant.

This verification is made by your affirmant and not by the claimant for the following reason; The claimants resides in a different County than where your affirmant maintains an office.

Dated: New York, New York
     May 22, 2025

                          /s/
                       JOHN SCOLA